UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NUMBER: 14-023 |
| TORRANCE SCOTT | SECTION: "A"(5) |

## REPORT AND RECOMMENDATION

Pursuant to an order of reference from the presiding District Judge (rec. doc. 496), presently before the Court is the 28 U.S.C. §2255 motion to vacate, set aside, or correct sentence of Defendant/Movant, Torrance Scott, and the Government/Respondent's opposition thereto. (Rec. docs. 491, 493, 504). For the reasons that follow, it will be recommended that Defendant/Movant's motion be denied.

Defendant/Movant Scott is an inmate of the United States Penitentiary in Atlanta, Georgia. On February 6, 2014, Scott and 14 others were charged in an eight-count indictment with conspiracy to distribute and to possess with the intent to distribute a quantity of cocaine and "crack." (Rec. doc. 1). Scott initially entered a "not guilty" plea to the charged offenses and stipulated to detention. (Rec. docs. 43, 44, 45). He subsequently secured the services of retained counsel. (Rec. docs. 138, 139, 201, 206). On November 6, 2014, Scott pled guilty to count one of the eight-count indictment in a comprehensive rearraignment proceeding in which he was meticulously advised of the litany of constitutional rights that he was waiving upon acceptance of his plea. (Rec. docs. 334, 449). Pertinent to the matter *sub judice* are Scott's sworn responses to the queries of the District Judge, as follows:

**THE COURT:** I have been advised, sir, that you wish to plead guilty to Count 1 of this eight-count indictment; is that correct, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor.

*      *      *      *      *      *

**THE COURT:** Mr. Scott, sir, have you had ample opportunity to discuss your case with your lawyers?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:** Are you satisfied with their services?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

*      *      *      *      *      *

**THE COURT:** All right, sir. Mr. Scott, sir, do you understand that you have the right to persist in your previous plea of not guilty? What this means, sir, is you previously went before the United States magistrate judge, you entered a plea of not guilty. You can persist or continue with that not guilty plea and go to trial and require the government to prove your (sic) guilty beyond a reasonable doubt, or you can change your previous plea of not guilty to guilty. Do you understand that, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor.

*      *      *      *      *      *

**THE COURT:** Sir, as I understand it, Count 1 of the indictment alleges that beginning at a time unknown but prior to November 2012, and continuing until on or about August 5, 2013, in the Eastern District of Louisiana, and elsewhere, you did knowingly and intentionally conspire to distribute and to possess with the intent to distribute a quantity of cocaine hydrochloride and a quantity of cocaine base, crack cocaine, which is in violation of the law. Sir, [is] this your -- you understand the charges against you?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

*      *      *      *      *      *

**THE COURT:** Did you, in fact, do the acts charged in the indictment that I have just explained to you?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:** Sir, if you're convicted on that charge, either upon a plea of guilty or after a trial, the maximum possible sentence that could be imposed upon you is a term of imprisonment of 20 years, a fine of $1 million, and 3 years of supervised release. There is also a mandatory special assessment of $100. Do you understand that, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:** There is no minimum sentence; is that correct?

**MR. MCMAHON:** No minimum sentence over 20.
(Prosecutor)

**THE COURT:** There's minimum [G]uidelines, of course, but there is no minimum statute sentence, okay, Mr. Scott. Do you understand that, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

$$* \qquad * \qquad * \qquad * \qquad * \qquad *$$

**THE COURT:** Sir, do you understand that I could impose the maximum possible sentence and fine on the charge which you're seeking to plead guilty? Do you understand that, Mr. Scott?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:** Mr. Scott, sir, have the [S]entencing [G]uidelines applicable to your case been explained to you by your lawyer?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:** Sir, do you understand that those [G]uidelines are advisory? They are not mandatory for the Court. In other words, I have to consider the [G]uidelines, but what my job is, is to impose a sentence on you that is reasonable under the law after I take into consideration and consider the [G]uidelines. Do you understand that, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:** In other words, sir, do you understand that I may or may not decide to sentence you within those [G]uidelines? Do you understand that, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

**THE COURT:**  Do you also understand, sir, that I can decide to impose a sentence on you that is greater or lesser than your [G]uidelines if I find that the [G]uidelines do not take into consideration other relevant facts concerning you or the crime for which you are seeking to plead guilty?  Do you understand that, sir?

**THE DEFENDANT:**  Yes, Judge, Your Honor, sir.

**THE COURT:**  Sir, before proceeding any further, do you have any questions that you would like to ask your lawyer in private?

**THE DEFENDANT:**  No, Judge, Your Honor, sir.

**THE COURT:**  Mr. Scott, sir, how do you wish to plead, guilty or not guilty?

**THE DEFENDANT:**  Guilty, Judge, Your Honor, sir.

**THE COURT:**  Sir, are you pleading guilty because you are, in fact, guilty of the crime charged?

**THE DEFENDANT:**  Yes, Judge, Your Honor, sir.

**THE COURT:**  I understand that there has not been a Plea Agreement; is that correct?

**MR. MCMAHON:**  Your Honor, there is no Plea Agreement.  What that means, Mr. Scott, is we have committed -- the government has committed to nothing. You're pleading without an agreement.  There is nothing that we have committed or promised or intimated or suggested that we may or may not do. Do you understand that?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  Sir, has anybody made any promise that has induced you to plead guilty?

**THE DEFENDANT:**  No, Judge, Your Honor, sir.

**THE COURT:**  Sir, has anyone threatened you or forced you to plead guilty?

**THE DEFENDANT:**  No, Judge, Your Honor, sir.

**THE COURT:**  Sir, has anyone told you that if you do not plead guilty, further charges will be brought against you or other adverse action will be taken against you?

**THE DEFENDANT:** No, Judge, Your Honor, sir.

**THE COURT:** Sir, has anybody made any comments to you whatsoever?

**THE DEFENDANT:** No, Judge, Your Honor, sir.

**THE COURT:** Sir, has anyone connected with the government, anyone connected with any law enforcement agency or anyone else at any time made any promise to you as to what your sentence will be?

**THE DEFENDANT:** No, Judge, Your Honor, sir.

**THE COURT:** All right. Mr. McMahon, do you have a Factual Basis?

**MR. MCMAHON:** Yes, Your Honor. Your Honor, I have provided this Factual Basis to Mr. Shah last week for review with his client, which, indeed, he did, in fact -- Mr. Scott suggested a change on page 2. The original should not concern the Court, but I did incorporate the change in consultation with Mr. Shah. And, Mr. Shah, is your client satisfied with that edit?

**MR. SHAH:** He is satisfied with that edit.
(Defense counsel)

**MR. MCMAHON:** Mr. Scott, have you gone over this Factual Basis with Mr. Shah?

**THE DEFENDANT:** Yes, sir.

**MR. MCMAHON:** Now, you signed it this morning. Is that your signature there?

**THE DEFENDANT:** Yes, sir.

**MR. MCMAHON:** You signed it because you agreed to the accuracy of the Factual Basis; is that true?

**THE DEFENDANT:** Yes, sir.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

**THE COURT:** Now, sir, this document alleges facts that the government says that they can prove against you beyond a reasonable doubt. Do you agree, sir, that the government can prove the facts contained in this Factual Basis, that the government can prove these facts against you beyond a reasonable doubt? Do you agree with that? Yes or no.

**THE DEFENDANT:**  Yes, Judge, Your Honor, sir.

**THE COURT:**  You agree, sir, that you are, in fact, guilty of and that you, in fact, committed the facts that are charged -- the acts that are charged in this Factual Basis?  In other words, are these facts accurate that are contained in this Factual Basis?

**THE DEFENDANT:**  Yes, Judge, Your Honor, sir.

**THE COURT:**  All right. Sir, you do understand that this document includes the government's evidence which they say they could prove against you beyond a reasonable doubt, and you agree that this is what you, in fact, did, what's contained in this document?

**THE DEFENDANT:**  Yes, Judge, Your Honor, sir.

*     *     *     *     *     *

**THE COURT:**  All right. Sir, knowing of all of the rights that I've advised you, sir, and those rights which you are waiving, again, sir, how do you wish to plead?  Guilty or not guilty?

**THE DEFENDANT:**  Guilty, Judge, Your Honor, sir.

**THE COURT:**  Sir, because I find that the plea is knowledgeable, voluntary, and has a basis in fact that contains all of the elements of the crime, I will accept your guilty plea and I will enter a judgment of guilty on your plea.  Mr. Scott, I'm going to order a presentence investigation report. I urge you, sir, to cooperate with the probation office in furnishing information for that report since the report will be important in my decision as to what your sentence will be.

On the date of your sentencing, you, your lawyer, and the government will have an opportunity to make objections to the report, if you have any objections, and to provide me with further information that you want me to consider in determining what your sentence should be. Do you understand that, sir?

**THE DEFENDANT:** Yes, Judge, Your Honor, sir.

*     *     *     *     *     *

(Rec. doc. 449, pp. 3, 5-6,
9-10, 11-14, 16, 17-18).

As alluded to during the course of the rearraignment, prior to that proceeding Scott had signed a five-page factual basis that set out in some detail the particular circumstances of the drug transactions upon which the indictment was based. (Rec. doc. 335). On November 28, 2014, Scott executed a *pro se* "motion to withdraw guilty plea" in which he represented that one of his retained attorneys had promised him a four- to five-year sentence if he pleaded guilty. (Rec. doc. 367). Although Scott had yet to be sentenced in this matter, he pointed to the punishment that had been meted out on a co-Defendant as support for the proposition that he would not be sentenced as a career offender. (*Id.*). However, during the preparation of the pre-sentence investigative ("PSI") report pertaining to him, Scott reportedly learned that another co-Defendant had been sentenced as a career offender, at which point Scott and his attorney realized that the latter had allegedly misled and misinformed the former as to the jail time he would or could be facing. (*Id.*). The Government filed a memorandum in opposition to Scott's motion to withdraw (rec. doc. 375) and counsel was appointed to represent him after his retained counsel was allowed to withdraw. (Rec. docs. 381, 382, 383). Scott subsequently filed a reply to the Government's opposition in which he acknowledged an understanding of the maximum sentence he faced and the possibility that he would be classified as a career offender. (Rec. doc. 394). On February 26, 2015, a hearing was held on Scott's motion to withdraw. (Rec. docs. 397, 432). Scott called no witnesses at that hearing. (Rec. doc. 432, p. 4). In anticipation of a proceeding like the one that is currently before the Court (rec. doc. 448, pp. 6-7), the Government called as a witness Scott's former retained counsel who was questioned and testified, in pertinent part, as follows:

**Q.** Going into the document, Mr. Scott writes, "Ravi Shah, of Regan and Sandhu law firm, promised my family and I a sentence of four to five years." Did you promise Mr. Scott a sentence of four to five years?

**A.** I did not promise Mr. Scott a sentence of four to five years. We were hoping that the Court would sentence Mr. Scott to a sentence in the range of 51 to 63 months. But I did not promise him that sentence, no.

**Q.** What did you base that surmise on?

**A.** Well, I looked at the amount of drugs that were involved in the case, and I looked at the Sentencing Guidelines, and I looked at Torrance's previous criminal history category. It was my understanding that he would go to a level 17, category VI, and that would be what Torrance would be on on the [G]uidelines if it were not for the fact that Torrance may also be a career offender. It was our hope that we would file a motion -- if he was sentenced as a career offender by Probation, then we would file a motion for downward deviation and departure and request from the [C]ourt and from the judge a sentence within the 51 to 63 month range.

**Q.** Did you tell Mr. Scott that the Court would have to go along and grant your -- any motion for a deviance or departure that you might file?

**A.** I did not tell Mr. Scott the Court would have to do so. I suggested to him reasons why the Court may do so.

**Q.** Mr. Scott also writes, and I'm quoting, "The facts" -- "His facts in which to support his accusation was the outcome of a co-defendant, Donelle Piugott case. Stating that no one was being sentenced to the career offender status. Ravi Shah gave me and my family time to see if four to five years was suitable, or if I was still considering trial." Did you tell Mr. Scott that no one was being sentenced as a career offender?

**A.** I did not.

     \*   \*   \*   \*   \*   \*

**Q.** And you were -- obviously, you accompanied Mr. Scott at the rearraignment?

**A.** Yes, I did.

**Q.** Page 10, when the Court informed Mr. Scott that he could receive the 20-year statutory maximum, and he agreed that he understood, and you also understood that as well; correct?

**A.** That is correct. I don't have the transcript in front of me, though, if you're asking me to refer to it, but that is correct. I do remember that.

           *         *         *         *         *         *

**Q.** No. I just -- did you in any way -- and Mr. Scott did affirm that he understood he could receive the maximum 20 years; correct?

**A.** That is correct.

**Q.** Did you in any way in your discussions with him tell him otherwise, that that was not true, that the [J]udge really couldn't sentence him within the Court's discretion to 20 years?

**A.** I did not tell him that, no.

**Q.** Page 11 I'm referring to, did you discuss the [G]uidelines with Mr. Scott?

**A.** Absolutely.

**Q.** Did you also inform Mr. Scott that the Court could impose a sentence greater than or lesser than the advisory [G]uidelines?

**A.** Yes, I did.

**Q.** Did you ever tell Mr. Scott that the [G]uidelines were mandatory?

**A.** I did not.

**Q.** And, in fact, the Court, on page 11 of the transcript, apprised Mr. Scott that the [G]uidelines were, indeed, advisory, and that the Court could sentence him either above or below the [G]uidelines if it chose. Correct?

**A.** The Court did do so.

**Q.** Most importantly, let's go to page 12. Did you ever promise any specific sentence to Mr. Scott to induce his guilty plea?

**A.** I did not.

**Q.** Page 13. Are you aware of any promises by anybody -- me, the agent, you, the Court, whomever -- regarding the sentence that Mr. Scott may receive?

**A.** Not regarding the sentence he would receive, no.

           *         *         *         *         *         *

**Q.** Mr. Shah, did you agree with Mr. Scott in his decision to plead guilty?

**THE COURT:** Say the question again. Ask the question again.

**MR. MCMAHON:** If he agreed with Mr. Scott's decision to plead guilty.

**THE WITNESS:** No, not really.

**BY MR. MCMAHON:**

**Q.** Well, let me put it to you this way: Do you feel that there is a fair and just reason for him to withdraw his guilty plea?

**A.** No, I do not.

**Q.** Can you expand on why you didn't agree with the guilty plea?

**A.** Well --

**Q.** And let me just back that up. You realized that if he were to go to trial that his -- his consequences would be -- he'd be facing probably life -- a life term in prison, I believe?

**A.** If he was superseded with a higher charge, he may be facing a life term in prison. But, as charged, even after the filing of an 851, he would not be facing a life term in prison.

**Q.** But he'd be facing a significant penalty --

**A.** Of course.

**Q.** -- a significant sentence?

**A.** Well, he's facing a significant sentence without it, of course. It would increase, by my calculations, from a maximum of 20 to a maximum of 30.

**Q.** Well, when you say you disagreed with his plea, I mean, was it coerced?

**A.** No. No, it wasn't coerced.

**Q.** Do you feel it was entered into knowingly and voluntarily?

**A.** Absolutely.

**Q.** Is there anything not contained[,] anything in your knowledge that contradicts anything in the plea colloquy?

**A.** No.

**Q.** So why did you disagree?

**A.** I have to make a case-by-case determination on what I believe the merits are of the case. I believe that this was a case that could have been tried.

**Q.** Yeah, but that's not the issue. The issue here is whether --

**A.** That's what you asked me.

**Q.** -- whether his plea was -- do you feel it was coerced?

**A.** No.

**Q.** Do you feel that Mr. Scott knew, understood, the consequences of his guilty plea?

**A.** Absolutely.

**Q.** Thirdly, do you feel that Mr. Scott understood the nature of the charges against him?

**A.** Absolutely.

(Rec. doc. 432, pp. 6-7, 8,<br>9-10, 14-16).

Upon being tendered to the defense, Scott's former counsel provided the following testimony on cross-examination:

**Q.** But you felt it was incumbent upon you to explain to him what the [G]uidelines were?

**A.** Well, absolutely.

**Q.** And how they would apply to his case?

**A.** Absolutely.

**Q.** And how they were fact-specific, meaning quantities of drugs drive how the [G]uidelines are applied; is that correct?

11

**A.**   Well, generally. I mean, in most cases, the quantities drive how the [G]uidelines are applied.   But in Mr. Scott's particular case, because of the number of prior offenses that he had, a conviction for any amount, regardless of what was considered to be in the foreseeable conduct of other co-defendants, any conviction as charged would have placed him as a career offender from Probation, in my opinion.

**Q.**   I appreciate that response.   But my question, again, was:   The amount of drugs that were attributed to Mr. Scott would have a direct impact on how the [G]uidelines would apply.   Can we agree upon that?

**A.**   They would have a direct impact to some extent.   But if Mr. Scott gets careered by Probation, then the amount of drugs is actually irrelevant as to how the [G]uidelines would be applied.   So they would be relevant as to what I stated to Mr. McMahon earlier, that, normally, he would go to offense level 17, go over to category VI.   However, because of his priors, if Probation careered him, it wouldn't have mattered what the drug amounts were if he was convicted of conspiracy to possess with the intent to distribute cocaine.

**Q.**   So I understood you to say the amount or quantity of drugs can be deemed irrelevant in a case like Mr. Scott's?

**A.**   I didn't say that it was irrelevant.   I simply am telling you my understanding of how the Probation does their PSI reports.

**Q.**   Now, when asked if you made a direct promise to Mr. Scott, and I think I quoted you correctly, you said you all were hoping for 51 to 63 months.   Did I state that correctly?

**A.**   You did.

**Q.**   Was that your hope or was that Mr. Scott's hope?

**A.**   It was both of our hopes.

**Q.**   But his hope had to be based on what you told him because, basically, he didn't know what the [G]uidelines were.   Am I correct?

**A.**   He knew what the [G]uidelines were.

**Q.**   Because you told him?

**A.**   Well, he owns a Federal Sentencing Guideline book that he has with him at the jail.   He's just as aware of what the [G]uidelines are as I am.   I helped him to interpret what things meant.   I showed him, you know, what definitions of

things were.  But he has a [G]uideline book.  Mr. Scott's not an unintelligent person.

**Q.**  Do you know of Mr. Scott's legal training that would give him the basis for interpreting the [G]uidelines?

**A.**  I don't believe -- if we're talking about just looking at drug quantities, you look at a table, it tells you an offense level, and then me, I would be the one that would have to determine where Mr. Scott would fall on category through VI due to his criminal history.  Obviously, he doesn't have the legal training to be able to do that.  But, yes, I think Mr. Scott's capable of looking at a drug quantity table and looking at the corresponding offense level.  Yes, I do.

      *        *        *        *        *        *

**Q.**  When asked earlier if you misled Mr. Scott at all and you said, "I don't believe I did," you didn't definitively state to the Court that you did not mislead Mr. Scott, did you?

**A.**  I did not intentionally or unintentionally mislead Mr. Scott. If Mr. Scott believes that he was misled, I can only speculate as to what he believes and how he feels. But I, on my part, did nothing that could be construed by me as intentionally or unintentionally misleading Mr. Scott.

**Q.**  Okay.  When asked, also, previously did you agree with Mr. Scott that entering a guilty plea was in his best interest, you basically this morning said no, did you not?

**A.**  That wasn't the question that was posed to me word for word.

**THE COURT:**  Okay. Well, explain yourself, counsel.

**THE WITNESS:**  Mr. McMahon asked me whether or not I agreed with Mr. Scott entering a guilty plea.  I did not – I did not believe the U.S. Attorney's Office through the evidence given to me in pretrial discovery, and even with the knowledge that Steven Haynes was going to be testifying against Mr. Scott, I could not say that I was certain beyond a reasonable doubt that Mr. Scott was guilty of the crimes that he was charged with in the indictment.  The first time I was -- could say I was sure of it was when Mr. Scott was standing next to me saying that he was guilty of the crimes charged in the indictment.

**BY MR. FLOYD:**

**Q.**  But prior to standing before the Court, the two of you obviously met and you advised him of the consequences of that plea, did you not?

**A.** Absolutely.  Absolutely.

**Q.**  And are you saying that during that advice that you weren't certain if, indeed, that plea was in Mr. Scott's best interest?

**A.**  I do believe that the plea -- I believe that taking a plea was in his best interest.  And the fact that because his case is triable does not necessarily mean Mr. Scott is going to win his trial.   Given the circumstances of what had happened up to that point in my representation of Mr. Scott, my belief that we had reasonable grounds to ask for a downward departure or deviance, although no guarantee whatsoever that Judge Zainey would depart or deviate from where we were if Mr. Scott was sentenced as a career offender, I thought it was in his best interest to plead guilty.

(Rec. doc. 432, pp. 17-20, 31-32).

The following pertinent testimony was elicited from Scott's former counsel on re-

direct examination:

**Q.**  Mr. Shah, your discussions with Mr. Scott regarding the [G]uidelines, did you make it clear that they were estimates only?

**A.**  Yes, I did.

**Q.**  Did you make it clear to Mr. Scott that the [G]uidelines would be calculated by the United States Probation Office, and ultimately it would be Judge Zainey who determined what the [G]uideline range and the base offense level actually was?  Did you advise him of that?

**A.**  I did.

**Q.**  During your discussions with Mr. Scott regarding the [G]uidelines, did you go over various scenarios or various options?

**A.**  Yes, I did.

**Q.**  Again, not knowing what the ultimate calculation would be; correct?

**A.**  Of course. I gave him what my estimates were.  And specifically, as I've said over and over again, I calculated it based on the amount of drugs which Mr. Scott was alleged to have been involved with with Mr. Haynes, as well as my calculations of where I believe his criminal history category would fall, and also if Probation and Parole decided to classify him as a career offender where I believed he would fall should he be classified as a career offender.

**Q.** Did Mr. Scott understand your explanations of the [G]uidelines?

**A.** Yes, he did.

**Q.** Did he ever indicate to you that he was confused or he did not understand the topic of [G]uideline discussions?

**A.** He did indicate that he was confused, he was unsure. I met with Mr. Scott and discussed the [G]uidelines. Mr. Regan met with Mr. Scott and discussed the [G]uidelines. David Arena from our office, who used to work in Probation and Parole, met with Mr. Scott and discussed the different possible [G]uidelines with him. There were three separate attorneys from our office that discussed it with Mr. Scott in case I was not doing an adequate job of explaining it to him.

**Q.** Did you discuss with Mr. Scott the alternative of either going to trial vis-à-vis entering a guilty plea?

**A.** Yes.

**Q.** And whose decision was it, Mr. Shah, to plead guilty?

**A.** It was my client's decision to plead guilty. I do not have the authority to make a decision for someone to plead guilty.

(Rec. doc. 432, pp. 33-34).

Although given another opportunity to present testimony in support of his motion to withdraw, Scott declined. (Rec. doc. 432, p. 35). Rather, he offered only argument in furtherance of his request which, as the District Judge aptly recognized, does not constitute competent evidence like the sworn testimony that had been elicited. (*Id.* at pp. 36-40). After painstakingly considering the factors set forth in *United States v. Carr*, 740 F.2d 339, 343-44 (5th Cir. 1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1865 (1985) and the three core concerns enunciated in *United States v. Gracia*, 983 F.2d 625, 627-28 (5th Cir. 1993), the District Judge found that Scott's previous guilty plea was knowledgeable, voluntary, and had a basis in fact and accordingly denied his motion to withdraw. (*Id.* at pp. 40-63).

A sentencing hearing subsequently went forward on March 26, 2015. (Rec. doc. 410). Prior to that proceeding, Scott's appointed counsel had filed a motion for downward departure and/or variance which the Government opposed. (Rec. docs. 403, 407, 408). At the sentencing hearing, the Guideline calculation was revealed to yield a total offense level of 29, a criminal history category of VI, and an imprisonment range of 151 to 188 months followed by three years of supervised release. (Rec. doc. 431, p. 4). Several family members spoke on Scott's behalf and the District Judge duly considered the sentences of Scott's co-Defendants and the particular facts and circumstances of his case,[1] ultimately varying below the Guidelines and sentencing Scott to a jail term of 139 months, to be followed by three years of supervised release. (*Id.* at pp. 4-33; rec. doc. 416). Scott directly appealed his conviction and sentence, arguing that his motion to withdraw guilty plea had been wrongfully denied and that his plea was induced on the erroneous advice of his counsel. On August 18, 2016, the Fifth Circuit affirmed Scott's conviction and sentence but declined to consider his ineffective-assistance-of-counsel claim without prejudice to his right to raise it on collateral review. *United States v. Scott*, 668 Fed.Appx. 110 (5th Cir. 2016), *cert. denied*, ___ U.S. ___, 137 S.Ct. 687 (2017). The instant proceeding followed. (Rec. docs. 491, 493, 504).

Although presented as separate grounds for relief, both of Scott's claims share a common feature in that they implicate his Sixth Amendment right to the effective assistance of counsel. To merit relief on a claim of ineffective assistance of counsel, a defendant seeking post-conviction relief must satisfy the two-pronged test articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984) by demonstrating

---

[1] Scott had a string of prior convictions which included two felony drug-possession offenses and two felony drug-trafficking offenses. (Rec. doc. 395, pp. 32-36). Indeed, Scott was on parole when he committed the acts that formed the basis of this prosecution. (*Id.* at pp. 34-35).

that: (1) counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. The burden of proving either element of *Strickland* is a heavy one and if proof of one element is lacking, the Court need not consider the other. *Id.* at 697, 104 S.Ct. at 2069. *Strickland* review is highly deferential and a prisoner seeking collateral relief must overcome the strong presumption that counsel's actions or inaction were part of a sound trial strategy. *Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir. 1984); *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981). The deficiency prong of *Strickland* requires a defendant to demonstrate that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-89, 104 S.Ct. and 2064-65. In the guilty-plea context, the prejudice prong of *Strickland* requires a defendant to prove that he would have insisted upon proceeding to trial had it not been for the incompetence of counsel. *Magnum v. Hargett*, 67 F.3d 80, 84-85 (5th Cir. 1995). Further, a finding of prejudice depends partly on the chances the defendant would have had if he had gone to trial. *Id.*

The test for determining the validity of a given guilty plea is "... whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 369 (1985); *see also*, *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709 (1969). On collateral review, voluntary and intelligent guilty pleas may not be challenged where a defendant is advised by competent counsel. *Bousley v. United States*, 523 U.S. 614, 621, 118 S.Ct. 1604, 1610 (1998). With respect to sentencing, a defendant must have "... a full understanding of what a plea connotes and its consequences." *Boykin*, 395 U.S. at 244, 89 S.Ct. at 1712. A defendant who is aware of the maximum term of imprisonment he faces is aware of the consequences of his plea, thus rendering it voluntary, intelligent, and valid for constitutional purposes. *United States v.*

*Pearson*, 910 F.2d 221, 223 (5th Cir. 1990), *cert. denied*, 498 U.S. 1093, 111 S.Ct. 977 (1991); *Hobbs v. Blackburn*, 752 F.2d 1079, 1082 (5th Cir.), *cert. denied*, 474 U.S. 838, 106 S.Ct. 117 (1985).

As clearly set forth in the pertinent portions of the rearraignment transcript quoted above, Scott testified under oath to his awareness of the 20-year maximum sentence that he faced; that no one had promised him anything in exchange for his plea; that his ultimate sentence would be determined by the District Judge alone; that the Guidelines, which were entirely advisory in nature, had been fully explained to him by his attorney; and that he was satisfied with the services of his counsel. Such sworn and solemn declarations in open court carry a strong presumption of verity. *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 1629 (1977); *Moya v. Smith*, 696 F.2d 329, 332 (5th Cir. 1983); *United States v. Sistrunk*, No. 08-CR-256, 2012 WL 4863787 at *3 (E.D. La. Oct. 12, 2012)(defendant's sworn satisfaction with his attorney's services).

In the memorandum supporting his motion to vacate, Scott "… asserts that his counsel ("Mr. Shah") promised him and his family that a plea of guilty would result in a sentenc[e] of 4-5 years, and in his professional opinion that Petitioner **would not** be subjected to the career offender enhancement." (Rec. doc. 491-1, p. 4)(emphasis in original). Just one sentence later, Scott argues "… that he pled guilty not because of a 'promise of a specific prison term,' but because his attorney affirmatively advised him that the career offender enhancement 'was not possible based on everything he knew of the law." *Id.* At the hearing that was held on Scott's motion to withdraw, his former counsel testified quite clearly that he did not advise Scott that no one in this case would be sentenced as a career offender, nor did he promise Scott a specific sentence. (Rec. doc. 432, pp. 7, 10). To the contrary, counsel's

testimony as a whole was to the effect that Scott's sentencing as a career offender was a very real possibility. Scott presents nothing to assail that sworn testimony. *See*, *e.g.*, *United States v. Ward*, No. 13-CR-138, 2017 WL 497676 at *3 (E.D. La. Feb. 6, 2017). More importantly, "[e]ven where counsel has rendered totally ineffective assistance to a defendant entering a guilty plea, the conviction should be upheld if the plea was voluntary. In such a case there is 'no actual and substantial disadvantage' to the defense." *United States v. Diaz*, 733 F.2d 371, 376 (5th Cir. 1984)(quoting *Diaz v. Martin*, 718 F.2d 1372, 1379 (5th 1983)). Here, because Scott was duly advised by the District Judge of the maximum sentence that he faced, his subsequent guilty plea "... was made voluntarily with the understanding required by law." *United States v. Ponce-Cruz*, No. 06-CR-122, 2009 WL 512042 at *2 (E.D. La. Mar. 2, 2009). The voluntary nature of Scott's guilty plea precludes any finding of prejudice needed to prevail on a claim of ineffective assistance of counsel. *DeVille v. Whitley*, 21 F.3d 654, 659 (5th Cir.), *cert. denied*, 513 U.S. 968, 115 S.Ct. 436 (1994). This claim is without merit.

In his second, *albeit* related, claim for relief, Scott argues that he was denied the effective assistance of counsel based on counsel's failure to object to his career-offender enhancement at sentencing and/or on direct appeal. More specifically, Scott argues that his prior conviction for a violation of Louisiana's Uniform Controlled Dangerous Substances Law, LSA-R.S. 40:967, does not qualify as a "controlled substance offense" under §4B1.2(b) of the United States Sentencing Guidelines.

A defendant is deemed to be a career offender under the Guidelines if: (1) he was at least 18 years old at the time he committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) he has at least two prior felony convictions of either a crime of violence or a

controlled substance offense.  U.S.S.G. §4B1.1(a).  Under U.S.S.G. §4B1.2(b), a "controlled substance offense" is a felony "… that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense."  Scott's previous qualifying state convictions were for conspiracy and possession with the intent to distribute marijuana and for possession with the intent to distribute cocaine.  Under Louisiana law, it is unlawful for anyone to " … knowingly or intentionally … produce, manufacture, distribute or dispense or possess with intent to produce, manufacture, distribute, or dispense … " marijuana or cocaine.  LSA-R.S. 40:966(A)(1), 40:967(A)(1).  The quoted provisions of Louisiana's Uniform Controlled Dangerous Substances Law thus fall squarely within the Sentencing Guidelines' definition of a "controlled substance offense."

The statutory elements of §§40:966(A)(1) and 40:967(A)(1) also duplicate the elements of the comparable federal offenses under 21 U.S.C. §841(a)(1).  *United States v. Daniels*, 723 F.3d 562, 577 n. 21 (5th Cir. 2013); *United States v. Ambriz*, 727 F.2d 378, 382 (5th Cir. 2013); *State v. Cooks*, 108 So.3d 1257, 1265 (La. App. 5th Cir.), *writ denied*, 123 So.3d 164 (La. 2013); *State v. Miller*, 587 So.2d 125, 127 (La. App. 2nd Cir. 1991).  A categorical comparison of the elements of the Louisiana offenses and the corresponding federal crimes supports the application of the career-offender enhancement on Scott.  *United States v. Martinez-Lugo*, 782 F.3d 198, 203 (5th Cir.), *cert. denied*, ___ U.S. ___, 136 S.Ct. 533 (2015); *see also United States v. Jaimes-Jaimes*, 611 Fed.Appx. 205 (5th Cir.), *cert. denied*, ___ U.S. ___, 136 S.Ct. 586 (2015).  None of the cases cited by Scott involved a career-offender enhancement based on predicate convictions emanating from Louisiana.  Suffice it to say here that the Fifth

Circuit and district courts within it have routinely upheld career offender enhancements based on previous Louisiana drug convictions. *United States v. Francis*, 674 Fed.Appx. 372, 373 (5th Cir. 2016); *United States v. Winbush*, 407 F.3d 703, 704 n. 1 (5th Cir. 2005); *United States v. Adams*, No. 05-CR-271, 2016 WL 3060135 at *1 (E.D. La. May 31, 2016).

Finally, in determining whether a prior conviction falls under a Guidelines sentencing enhancement provision, the Court looks to the elements of the prior offense and may consider documents such as the charging instrument underlying the predicate prosecution. *United States v. Price*, 516 F.3d 285, 287 (5th Cir. 2008); *United States v. Morales-Martinez*, 496 F.3d 356, 357-58 (5th Cir. 2007). Attached to the PSI that was generated in this case were the charging instruments that led to Scott's previous state drug convictions and that clearly charged him with the " ... possession, with the intent to distribute or dispense, ... marijuana," " ... conspiracy to possess, with the intent to distribute or dispense, ... marijuana;" and, with the " ... possession, with intent to distribute, ... cocaine." (Rec. doc. 395, pp. 45-46). Those documents were sufficient to prove the existence of the previous convictions, which qualified for career-offender sentence enhancement. *Francis*, 674 Fed.Appx. at 373. As "[c]ounsel is not required by the Sixth Amendment to file meritless motions," *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995), Scott was not deprived of the effective assistance of counsel based on counsel's failure to object to his career-offender enhancement at sentencing or on direct appeal.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that the 28 U.S.C. §2255 motion to vacate, set aside, or correct sentence of Defendant/Movant, Torrance Scott, be denied.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[2]

New Orleans, Louisiana, this __29th__ day of _____ August _____, 2017.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.